Filed 4/17/13

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| KENDALL KLEVELAND, | D060906 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2010-00061990-CU-MC-NC ) |
| SIEGEL & WOLENSKY, LLP, et al., | |
| Defendants and Appellants. | |


APPEAL from an order of the Superior Court of San Diego County, Timothy M. Casserly, Judge. Affirmed.


Wingert Grebing Brubaker & Juskie, Charles R. Grebing, Deborah S. Dixon; Hollins & Levy, Byron S. Hollins and Laura M. Levy for Defendants and Appellants.

Law Offices of Gregory S. Day, Gregory S. Day; Law Offices of Andrew A. Kurz and Andrew A. Kurz for Plaintiff and Respondent.

This is the third appeal arising out of a probate matter involving Scott Leach's (Scott)[1] challenge of the trustee's (Kendall Kleveland (Kendall)) handling of a trust. In the first appeal, we affirmed the trial court's final judgment resolving, among other issues, Scott's petition for breach of trust and removal of Kendall as trustee.[2] (See *Leach v. Kleveland* (Mar. 24, 2010, D054532) [nonpub. opn.] (*Leach v. Kleveland*).) In that opinion, we affirmed the judgment in its entirety, including the trial court's determination that Scott filed and pursued the petition in "bad faith" and for "improper purpose."

In the second appeal, Scott challenged an order approving a petition for approval of accounting and proposed plan of distribution of trust assets. As part of that appeal, Boris Siegel filed a brief appealing the court's award of sanctions against him. We affirmed both the order and the award of sanctions. (See *Leach v. Kleveland* (Nov. 20, 2012, D061371) [nonpub. opn.].)

This third appeal involves a malicious prosecution suit brought by Kendall against Scott and his attorneys Siegel & Wolensky, LLP; Boris Siegel; Lewis M. Wolensky; and Joshua J. Herndon (collectively Attorney Defendants) arising out of Scott's petition for breach of trust and removal. Attorney Defendants moved to strike the malicious prosecution suit under Code of Civil Procedure section 425.16,[3] the anti-SLAPP

---

[1]    Because this matter involves people with the same last name, we refer to individuals by their first name not as a sign of disrespect, but for clarity and convenience.

[2]    Boris Siegel and Siegel & Wolensky LLP represented Scott in his appeal.

[3]    Statutory references are to the Code of Civil Procedure unless otherwise specified.

(strategic lawsuit against public participation) statute. The court denied the motion and awarded Kendall $20,055 in attorney fees and costs.

Attorney Defendants appeal, contending the court erred in finding Kendall demonstrated a probability of success on the merits. They assert that at the time the malicious prosecution suit was initiated, there was no final determination of the merits of the underlying trust dispute. In addition, Attorney Defendants argue probable cause existed in bringing the petition for breach of trust and removal and that petition was not initiated with malice. Also, Attorney Defendants maintain that the court abused its discretion by awarding attorney fees and costs because the court failed to include "factual support with specific circumstances" to justify the award in the order.

We reject all of Attorney Defendants' contentions and affirm the order. In doing so, we are troubled by Attorney Defendants utter failure to provide a "summary of significant facts limited to matters in the record." (Cal. Rules of Court, rule 8.204(2)(C)).[4] For example, Attorney Defendants' opening brief omits the most critical fact of the entire appeal: the trial court found the petition for breach of trust and removal was filed and pursued in bad faith and for an improper purpose.

We further are perturbed by Attorney Defendants use of "facts" and "evidence" beyond the petition for breach of trust and removal in an attempt to manufacture a reasonable justification for filing and pursuing the petition. In taking this tact, Attorney Defendants have misrepresented the record and ignored established case law without explanation or justification.

---

4      All references to any rule or rules are to the California Rules of Court.

3

This appeal shares the fate of the two previous appeals involving the underlying probate matter. We affirm the order of the superior court. In addition, there must be consequences for Attorney Defendants' tactics in this appeal, which are patently frivolous. We find no support in law or fact for the arguments advanced by Attorney Defendants here. In other words, this appeal indisputably has no merit. Because we determine "any reasonable attorney would agree that the appeal is totally and completely without merit," we deem sanctions are appropriate. (*In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 650 (*Flaherty*).)[5]

FACTUAL AND PROCEDURAL BACKGROUND

Kendall brought a malicious prosecution suit against Attorney Defendants and Scott.[6] The malicious prosecution suit was based on a petition for breach of trust and removal of Kendall as trustee of the trust. Scott, who was represented by Attorney Defendants, filed the petition. After a bench trial involving Scott's petition as well as other petitions, the court found against Scott and did not award him any of his requested relief. The court determined Scott had "filed and pursued the Petition for Breach of Trust

[5]     On the eve of oral argument, Attorney Defendants, by way of a letter, attempted to withdraw their appeal of the order denying their anti-SLAPP motion. They indicated they wanted to focus at oral argument on the superior court's award of attorney fees and the potential imposition of sanctions for this appeal. We suspect they abandoned a portion of their appeal so they did not have to defend its merits. At oral argument, however, Attorney Defendants repeatedly discussed the same contentions they proffered in challenging the order denying their anti-SLAPP motion. We thus discuss the merits of the anti-SLAPP motion because of Attorney Defendants' approach at oral argument and such a discussion is necessary to determine the validity of the attorney fees awarded by the superior court and the imposition of sanctions on appeal.

[6]     Scott is not a party in this appeal.

4

and Removal in bad faith and for an improper purpose."  The court also awarded Kendall attorney fees and costs under Probate Code section 15642, subdivision (d) as sanctions.

Scott appealed the final judgment in the trust litigation, and we affirmed the judgment in its entirety.  (See *Leach v. Kleveland*, *supra*, D054532.)  To provide some necessary background information, we cite liberally to that opinion.

The Trust Litigation[7]

Kendall was the "successor trustee of the Kleveland Family trust (the family trust).  Scott . . . , the son of deceased beneficiary Janis Kleveland (Janis), filed a petition in probate court alleging Kendall breached his duties as trustee, seeking title to real property that was the major asset of the trust, an accounting, and removal of Kendall as trustee.  Kendall brought a petition for directions, requesting a sale of the real property and instructions as to how to properly distribute the assets of the trust."  (*Leach v. Kleveland*, *supra,* D054532.)

*The Family Trust*

"The family trust was established by Chester R. and Jeanne M. Kleveland in 1995.  Jeanne passed away in January 2003.  Chester passed away in March 2003.

---

[7]    It is Attorney Defendants' description of the trust litigation where the opening brief quickly loses its way.  Attorney Defendants fail to provide us with an accurate description of the trust litigation and what the court actually found.  Alternatively, they provide us with a selection of "facts" that fail to provide an accurate picture of the litigation, especially Scott's petition for breach of trust and removal.  This is all the more disappointing because the trial court provided a clear, detailed statement of decision, Scott appealed the trial court's final judgment, and we provided a 29-page unpublished opinion affirming the judgment.  Further, Boris Siegel and Siegel & Wolensky, LLP represented Scott in that appeal.  Attorney Defendants, however, ignore much of the statement of decision and our opinion, almost to the point of pretending they do not exist.

5

"Chester and Jeanne had two children, Kendall and Janis. Chester and Jeanne's trust provided that, upon their deaths, Kendall would become the successor trustee and the trust estate was to be divided equally between Kendall and Janis. The trust instrument granted Kendall, as successor trustee, discretion to divide the trust estate in any manner he determined to be appropriate, so long as an equal division was accomplished.

"At the time of Chester's death, the primary assets of the trust estate were (1) a house located at 266 Rodney Avenue in Encinitas, California (the Rodney Property); and (2) various bank accounts, life insurance policies and a $107,000 debt owed by Kendall to his parents (the Liquid Assets). The Rodney Property was worth at least $400,000. The Liquid Assets were worth approximately $280,000. In addition, the trust owned a few items of lesser value, including personal property, furnishings inside the Rodney Property, and a Ford Taurus.

"Following the death of their parents, Kendall and Janis discussed the manner in which the trust estate should be divided. Janis wanted the Rodney Property. This was acceptable to Kendall, in part because he and his wife already owned their home in Ventura County, whereas Janis did not own a home. In their discussions, Kendall and Janis developed a conceptual plan for the ultimate distribution of the trust assets. That plan contemplated that Janis would receive the Rodney Property, the furnishings and personal property (except for a few items of sentimental value to Kendall), Kendall would receive the Liquid Assets, and Janis would make an equalization payment to Kendall to effectuate an equal distribution of the trust estate. Based upon a valuation

6

prepared by an accountant and an attorney hired by Kendall to assist with the trust, the expected amount of the equalization payment from Janis to Kendall was approximately $65,000.

"At the time of their discussions, Janis was ill and not working. Janis told Kendall that she was receiving government health care benefits. She also told Kendall that she was concerned that if she received the Rodney Property, then she might no longer qualify for those benefits, and that a distribution of real property to her might result in an increase in property taxes. Janis asked for some time to investigate these issues before any distributions were made.

"By the time of these discussions, Janis and some of her extended family and friends had already moved into the Rodney Property. Kendall was willing to accommodate Janis's wishes and concerns and did so by allowing Janis and her extended family to remain in the Rodney Property while Janis had time to investigate the matters of concern to her and the details of the anticipated equalization payment were being established.

"Kendall believed that he and Janis had a common understanding as to the expected final distribution of the trust assets. Kendall would receive the Liquid Assets and Janis would receive the Rodney Property and would make an equalization payment to Kendall. Kendall also believed that Janis would ultimately resolve her concerns about her continuing entitlement to government benefits. He further believed they would ultimately reach an agreement concerning the amount and timing of the equalization payment to be made by Janis. Kendall allowed Janis and her extended family to continue

7

to live in the Rodney Property even though the overall trust distribution arrangement had not been finalized.

"At this time Kendall also assumed personal control over the Liquid Assets in the trust and used them to purchase items for his own personal use, including a new car and condominium. He did so based upon his belief that a final distribution of the trust's assets was imminent, and he would receive an amount at least equal to the Liquid Assets of the trust.

"Kendall and Janis did not live in the same community and did not have a close relationship. Unbeknownst to Kendall, Janis at some point determined not to resolve the concerns about her receipt of distributions from the trust and determined not to commit to any equalization payment to Kendall. Janis was content to remain in the Rodney Property without receiving any formal distributions from the trust. Janis and her extended family consulted with an attorney about the consequences of Janis not finalizing the distribution from her parents' trust before her own expected death. After consulting with an attorney, Janis took no further action of any significance to resolve the issues pertaining to the distribution from the trust. She took no meaningful steps to resolve her stated concerns about the effect of a trust distribution on her government benefits. She also declined to agree to any equalization payment, even though Kendall, who was unaware of the details of Janis's illness, offered Janis the option of paying the equalization amount over a period of 30 years.

"Janis passed away from lung cancer in October 2005. By that time, Janis and some of her extended family had been living in the Rodney Property for more than two

8

years without paying rent, taxes or insurance. None of Janis's family members informed Kendall of Janis's passing. Kendall learned of Janis's death from a family friend, after Janis's funeral.

"Scott is Janis's son He is the executor of her estate. There were no assets in Janis's estate, other than Janis's interest in the family trust." (*Leach v. Kleveland*, *supra*, at pp. 2-6.)

*The Dispute*

After Janis's death, "Scott took the position that Kendall was required to convey the Rodney Property to him, as executor of Janis's estate, without any equalization payment, even though the Rodney Property is worth more than the combined Liquid Assets of the trust, including the Liquid Assets already spent by Kendall.

"Scott refused to discuss the trust estate with Kendall, instead insisting that he was going to retain an attorney to 'contest the will.' Not long thereafter, counsel for Scott began posing questions to Kendall's attorney about the details of an accounting which had been prepared. Initially, there was some confusion because Scott had obtained a copy of a draft accounting. However, from the outset Merwyn J. Miller, Kendall's trust attorney, explained the accounting was only a draft, and the actual accounting was provided to Scott's attorney well before any litigation commenced. Despite that, Scott's attorney demanded that Kendall submit documentation concerning a series of loans which his parents had made to him over a 20-year period, including a demand that Kendall 'provide an itemization of each loan Kendall received from [his parents], and each payment he made on those loans, noting whether the payment was principal or interest.' Further,

9

Scott demanded that Kendall provide 'documents, such as cancelled checks, that substantiate any payments he has made.'

"Shortly thereafter, Scott filed a petition for breach of trust and removal of successor trustee. In the petition, Scott alleged Kendall breached his duties as trustee by failing to substantiate his accounting and that he owed more to the trust than was disclosed in the accounting. He further requested that the court find Kendall opposed the petition in bad faith and that he be awarded attorney fees and costs. Scott also requested double damages, that Kendall be removed as trustee, and that Kendall not be paid his attorney fees and costs incurred in defending the action.

"At or about the time he filed Scott's petition, Scott's counsel wrote to Kendall's attorney and stated that if Kendall wished to avoid 'long and expensive' litigation, then he would have to transfer the Rodney Property to Scott, without any equalization payment.

"Kendall filed a petition for instructions, seeking to compel the sale of the Rodney Property so that the trust assets could be evenly divided. The petition also requested a final accounting so that the trust assets could be evenly divided and distributed. The petition sought an order requiring Scott to vacate the property and to pay back rent. Scott requested he be paid his attorney fees incurred in the proceeding from the proceeds of the sale of the property. In his response to Kendall's petition, Scott asserted that it was brought in bad faith and that he should be paid his attorney fees and costs incurred in defending the petition.

"Scott filed a second petition, alleging in more detail Kendall's alleged bad acts as stated in the first petition but seeking to have the court compel Kendall to distribute the

10

Rodney Property to Scott. In his response to this petition, Kendall requested that Janis's estate be charged with attorney fees and costs incurred in defending the litigation.

"A court trial was held, after which the court issued a detailed statement of decision. Kendall prevailed on all petitions and was awarded his attorney fees and costs from Scott's share of the estate based on the trial court's determination that Scott had filed and prosecuted the petition for breach of trust and removal in bad faith.

"The court found that it 'would not be equitable to grant Scott any of the relief he is requesting against Kendall. . . . [A]t all relevant times, Kendall acted reasonably and in good faith in connection with all of the matters that are the subject of this proceeding. In fact, Kendall went beyond his legal obligations to Janis, and took extraordinary measures to accommodate Janis' needs and desires.' 'Kendall let Janis and her extended family live in the Rodney Property for an extended period, when he had no obligation to do so. He expressed a willingness to accommodate Janis' request to receive the Rodney Property in the final distribution of trust assets, even though the Rodney Property clearly constituted more than the one-half of the trust estate to which she was entitled. He delayed finalizing trust distribution plans so that she could address her concerns about the potential impacts of any distribution on her reported receipt of public benefits. He let her and her extended family use the Ford Taurus, a trust asset. He let her and her extended family use the furnishings and personal property in the Rodney Property. He included in the trust estate certain life insurance proceeds to which he personally was entitled. He personally paid certain trust expenses out of his own pocket.' Further, '[w]hile Kendall was making all of these accommodations for Janis, Janis failed to follow through on the actions she had

11

indicated to Kendall she would undertake' and 'took no meaningful steps to facilitate the ultimate distribution of trust assets.'

"The court did fault Kendall for his decision to take and spend liquid assets in the trust prior to a final distribution of the trust assets to the beneficiaries, but found because Kendall was a layperson and not a professional fiduciary such as a lawyer, it was 'an innocent mistake, and one which the Court may properly excuse under Probate Code [section] 16440[, subdivision] (b).' The court also found 'it would not be equitable to allow Scott to leverage Kendall's innocent mistake into the unjust relief he is requesting in this case.'

"The court found that Kendall adequately disclosed the fact that he had not paid interest on a loan from his parents from between March 2003, when his father Chester passed away, and October 2003, when a condominium that secured the loan was sold. This was evidenced by a letter sent by Scott's attorney to Kendall's attorney before the litigation was commenced.

"The court found that Kendall did not conceal any debt acknowledgements reflecting cash disbursements from the trust. He provided them to his attorney and accountant in a timely manner.

"The court found that in order for the estate to be equally divided, the Rodney Property needed to be sold as Janis's estate had no assets from which to make an equalization payment, the trust had incurred fees and expenses that needed to be paid, and Kendall was entitled to an award of attorney fees from Janis's share of the trust estate. The court further ordered Kendall to prepare an accounting to accomplish the final

distribution of the trust assets and reserved jurisdiction 'concerning the final accounting of the trust estate and the proper distribution of trust assets.'

"The court found that Kendall's testimony at trial was credible, and Scott's was not.

"The court further found that Scott's petition was filed and prosecuted in bad faith and for an improper purpose, 'namely, to try to leverage Kendall into making an unequal distribution of trust assets.' The court based this finding on (1) the demeanor of Scott while testifying and the substance of his testimony; (2) the fact that the verified allegations in the petition were to a significant degree unsupported by the evidence; (3) Scott's testimony that Janis did not receive certain documents from Kendall's attorney; (4) inconsistencies between Scott's testimony and documentary evidence; (5) the manner in which Scott conducted the litigation even after Kendall produced persuasive evidence the total amount of loans he received from his parents was $107,000; (6) a letter from Scott's attorney that he was willing to withdraw the petition if Kendall transferred the property without any equalization payment; and (7) Kendall's offer, prior to the litigation being filed, to cooperate in 'any reasonable manner' in effectuating an accounting of the trust assets and distribution of the estate, to which Scott responded by filing the petition.

"Based upon the court's finding the petition for removal of Kendall was filed in bad faith, the court ordered, under Probate Code section 15642, subdivision (d) that Scott pay Kendall's attorney fees incurred in defending the action from his portion of the distribution of trust assets. The court reserved jurisdiction to determine the reasonable amount of such fees.

"The court disregarded the testimony of Scott's personal property appraiser Joe Paytas concerning the value of property at the Rodney Property as several valuable items were missing from the residence at the time of his inspection. The court also rejected the testimony of Scott's accountant expert Jeanne Goddard because she was not provided with all relevant evidence by Scott and/or his counsel, including a letter sent by Kendall to Janis before the litigation was instituted. That letter disclosed that Kendall had not paid interest on the loan from his parents from March 2003, when Chester died, and October 2003, when the loan was paid off. The court also found Goddard's opinions were based on incorrect assumptions.

"The court denied Kendall's request for back rent, finding it would not be equitable because Kendall had use of the liquid assets of the trust while Janis had use of the Rodney Property. The court also ruled that because the court had ordered the property sold, Scott and his extended family should vacate the property and, if they failed to do so, Janis's share of the trust assets would be charged with the fair market rental value of the property. The court denied Kendall's request for an order directing Scott's extended family to vacate the property as they were not parties to the litigation." (*Leach v. Kleveland*, *supra*, D054532.)

*The Malicious Prosecution Suit and Anti-SLAPP Motion*

In response to Kendall's complaint for malicious prosecution, Attorney Defendants filed a special motion to strike the complaint under the anti-SLAPP statute. After considering the evidence in support of and in opposition to the anti-SLAPP motion and hearing oral argument, the court issued a minute order denying the motion.

14

The court found that the malicious prosecution complaint "arises from" the exercise of free speech or petition rights as defined in section 425.16, subdivision (e). It thus shifted the burden to Kendall to show a probability of success on the merits. In finding Kendall had demonstrated such a probability, the court noted, in regard to the trust litigation, that:

> "The court sanctioned [Scott] for abusive discovery, ruling that the manner in which [his] discovery was conducted was inappropriate considering the nature of the dispute and amount in controversy. [Citation.] Litigation ensued for two years and the action ended in a trial lasting approximately two weeks. This court ruled that the petition for breach of trust had been filed and prosecuted in bad faith and for the improper purpose of forcing [Kendall] to convey the trust's real property to [Scott] with[out] an equalization payment. [Citation.] The court found that expensive and inconvenient litigation was used to try to force an unequal division of the trust assets. [Citation.] The court found that [Kendall] made the one innocent mistake of spending the trust's liquid assets before the final distribution of trust assets to its two beneficiaries, which a professional fiduciary trained in the law would not have done. [Citation.] The court, however, excused the innocent mistake under Probate Code section 16440[, subd. (b)], and stated that the innocent mistake could not be used to force the unjust relief sought. [Citation.] The appellate court affirmed the trial court's findings, including that the petition for removal was brought in bad faith. [Citation.] The petitions filed by [Scott] terminated in favor of [Kendall]. See *Ray v. First Federal Bank* (1998) 61 Cal.App.4th 315, 318 [*Ray*]. Plaintiff has demonstrated the requisite probability of prevailing as he has stated and substantiated a legally sufficient claim. See *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123. As such, the motion must be denied."

The court also awarded Kendall attorney fees and costs as sanctions in the amount of $20,055. In doing so, the court explained:

> "Attorney Defendants' motion is frivolous and/or intended to harass [Kendall]. As [Kendall] correctly points out, the motion can be boiled down to two theories: (1) that the underlying action has not

15

been terminated in [Kendall's] favor because the trial court instructed [Kendall] to submit further accounting and (2) that because the trial court found a technical breach of fiduciary duty caused by an excused innocent mistake, Attorney Defendants and [Scott] were justified in filing the petition for breach of trust and removal. [Citation.] As the appellate court affirmed the trial court findings, [Scott's] petitions in the underlying action were terminated in [Kendall's] favor. See *Ray*, [*supra,*] 61 Cal.App.4th at [p.] 318. Also, as adequately stated in the statement of decision in the underlying case, the innocent mistake of a layperson trustee cannot be used to leverage the unjust relief sought. [Citation.] In terms of this lawsuit, the technical violation also cannot be used as justification for a motion clearly lacking merit and filed to harass and/or cause unnecessary delay."

Attorney Defendants timely appealed the superior court's order.

DISCUSSION

I

*BURDEN OF PROOF AND STANDARD OF REVIEW*

A special motion to strike under section 425.16 allows a defendant to gain early dismissal of a lawsuit that qualifies as a SLAPP. (§ 425.16, subd. (b)(1).) A two-step analysis is required when the superior court is requested to rule on a special motion to strike under the anti-SLAPP statutory framework. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).) The court is first to determine if the lawsuit falls within the scope of the statute, as arising from protected activity (generally, petitioning or free speech). (*Ibid*., § 425.16, subd. (b)(1).) The defendant bears the burden of demonstrating that a cause of action in the lawsuit is one "arising from" protected activity. (§ 425.16, subd. (b)(1).)

16

The second prong of the statute deals with whether the plaintiff has "demonstrated a probability of prevailing on the claim." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 (*Navellier*).) Under section 425.16, subdivision (b)(2), the trial court in making these determinations considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (*Ibid.*) For purposes of an anti-SLAPP motion, "[t]he court considers the pleadings and evidence submitted by both sides, but does not weigh credibility or compare the weight of the evidence. Rather, the court's responsibility is to accept as true the evidence favorable to the plaintiff . . . ." (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212.) A plaintiff "need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP." (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291.)

We review de novo the trial court's rulings on an anti-SLAPP motion. (*Thomas v. Quintero* (2005) 126 Cal.App.4th 635, 645.)

II

*PROBABILITY OF SUCCESS ON THE MERITS*

A malicious prosecution suit is subject to the anti-SLAPP statute. (*Daniels v. Robbins* (2010) 182 Cal.App.4th 204, 215.) Here, this general rule is not disputed. Thus, we focus on Attorney Defendants' challenge to the court's finding that Kendall had demonstrated a reasonable probability of success on the merits.

In opposing the anti-SLAPP motion, Kendall had the burden to present evidence sufficient to demonstrate a probability that he would prevail on his malicious prosecution

17

claim against Attorney Defendants. (§ 425.16, subd. (b)(1); *Navellier*, *supra*, 29 Cal.4th at p. 89; *Equilon*, *supra*, 29 Cal.4th at pp. 58-59.) " '[T]he plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' [Citations.]" (*Navellier*, *supra*, 29 Cal.4th at pp. 88-89.)

To establish a claim for malicious prosecution against Attorney Defendants, Kendall must plead and prove that the prior action " '(1) was commenced by or at the direction of the defendant and was pursued to a legal termination in [Kendall's] favor [citations]; (2) was brought without probable cause [citations]; and (3) was initiated with malice [citations].' [Citation.]" (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 676 (*Crowley*).)

Here, Attorney Defendants claim there was no final determination on the merits of the "trust dispute." They also assert Kendall failed to show the petition for breach of trust and removal lacked probable cause and was initiated with malice.[8] We reject these contentions. Further, we determine none of Attorney Defendants' arguments can be made based on the record or any existing authority.

---

[8]    Again, Attorney Defendants essentially abandoned their challenge of the superior court's finding that Kendall had demonstrated a reasonable probability of success on the merits. Nevertheless, during oral argument, Attorney Defendants frequently argued that they had probable cause to bring the anti-SLAPP motion and Kendall could not prove malice. Attorney Defendants also insisted that there was no final determination of the merits when they appealed this matter. Although Attorney Defendants attempted to frame these arguments as only going to the attorney fees and sanctions issues, the arguments clearly relate to Kendall's ability to demonstrate a reasonable probability of success on the merits.

A. Final Determination on the Merits

The trust litigation began when Scott filed petitions for breach of trust and removal and distribution of the Rodney Property. It is undisputed that the court denied both of these petitions and ruled that Scott was "entitled to no relief in connection with" the petitions. Scott appealed the final judgment, which we affirmed. (See *Leach v. Kleveland, supra*, D054532.) Based on the petition for breach of trust and removal, Kendall filed the malicious prosecution suit.

Attorney Defendants ignore the trial court's statement of decision, final judgment, and our opinion affirming the judgment and contend that there has been no determination on the merits because Kendall has not filed a final accounting and there has been no finding or approval as to the ultimate distribution of the trust assets. Put differently, Attorney Defendants now argue it does not matter that the petition for breach of trust and removal has been resolved in Kendall's favor because a dispute under the family trust remains as the distribution under the trust has not been finalized.[9]

Not surprisingly, Attorney Defendants cite no authority for their position. Nor could they. A malicious prosecution action arises out of a "prior action" that was commenced by or at the direction of the defendant and was pursued to a legal termination in the plaintiff's favor. (*Crowley, supra*, 8 Cal.4th at p. 676.) The action here is Scott's petition for breach of trust and removal. There can be no dispute that this matter was terminated in Kendall's favor as the court ruled in favor of Kendall after trial and we

_____

[9] Since the filing of this appeal, the probate court has approved the final distribution of the trust assets. As we discuss above, Scott appealed the order of approval, which we affirmed in its entirety. (See *Leach v. Kleveland, supra,* D061371.)

19

affirmed the final judgment. (See *Ray*, *supra*, 61 Cal.App.4th at pp. 318-319 ["[T]he appellate decision affirming . . . judgment . . . both marked and constituted favorable termination of that case . . . . Not only was the decision 'favorable,' . . . it also accomplished the final termination of the case."].)

Further, the superior court specifically cited *Ray*, *supra*, 61 Cal.App.4th 315 in its minute order denying Attorney Defendants' anti-SLAPP motion. Attorney Defendants, however, do not attempt to explain why *Ray* is distinguishable from the instant matter. Instead, without authority, they attempt to recharacterize the "prior action" from Scott's breach of trust and removal petition to the final distribution of trust assets. This argument is demonstrably frivolous in light of *Ray*, Attorney Defendants' lack of any authority to support their position, and the record.

B. Probable Cause

An action is deemed to have been pursued without probable cause if it was not legally tenable when viewed in an objective manner as of the time the action was initiated or while it was being prosecuted. The court must "determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable." (*Sheldon Appel Co. v. Albert & Oliker* (1989) 47 Cal.3d 863, 878 (*Sheldon Appel*).) "The resolution of that question of law calls for the application of an objective standard to the facts on which the defendant acted. [Citation.]" (*Ibid.*; italics omitted.) The test the court is to apply is whether "any reasonable attorney would have thought the claim tenable . . . ." (*Id*. at p. 886.) The tort of malicious prosecution also includes the act of "continuing to prosecute a lawsuit discovered to lack probable cause." (*Zamos v. Stroud*

20

(2004) 32 Cal.4th 958, 973.)  In determining the probable cause issue, the same standard applies "to the continuation as to the initiation of a suit."  (*Id*. at p. 970.)

"In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought.  A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164-165 (*Sangster*).)

In determining whether the prior action was legally tenable, i.e., whether the action was supported by probable cause, the court is to construe the allegations of the underlying complaint liberally, in a light most favorable to the malicious prosecution defendant.  (*Sangster*, *supra*, 68 Cal.App.4th at p. 165.)  Here, even applying this liberal reading to Scott's petition, we are satisfied that Kendall easily demonstrated a lack of probable cause to bring the petition.

We have the benefit of a thoroughly reasoned and well-written statement of decision to guide us in evaluating the existence of probable cause.  In regard to Scott's petition for breach of trust and removal, the court found:

> "Scott filed and pursued his Petition for Breach of Trust and Removal in bad faith and for an improper purpose.  After Janis' death, Scott felt that he was entitled to remain in the Rodney Property and was entitled to receive title to the property.  But the Rodney Property is clearly worth more than the Liquid Assets and the distribution of the Rodney Property to Scott would clearly result in an unequal distribution of trust assets, in direct conflict with the terms of the trust.  There is no credible evidence of any assets in Janis' estate, so Janis' estate cannot be expected to be able to make

21

an equalization payment to effectuate an equal division of trust assets. Scott thought he could use the expense and inconvenience of litigation to leverage Kendall into conveying the Rodney Property to Scott as part of an unequal distribution of the trust assets. Scott filed and pursued the Petition for Breach of Trust and Removal for this improper purpose."

The court thus found that Scott brought the petition for the purpose of forcing an unequal distribution of the trust assets: a goal that was not warranted in equity or law. Further, the record is clear that Attorney Defendants were on board with this strategy. Boris Siegel sent Kendall's attorney a letter dated September 26, 2006, offering to dismiss the petition "before our clients embark down the long and expensive road of litigation" if Kendall transferred the Rodney Property to Scott "free and clear of any indebtedness to your client." In addition, the court found that Scott, through Attorney Defendants, made unreasonable discovery demands on Kendall in regard to the alleged $107,000 owed. The court also noted that Scott's counsel was invited to contact Kendall's counsel "so that [they] might discuss a reasonable and efficient manner in which to proceed to a final resolution and distribution of the estate[,]" but instead of making any "meaningful effort to determine an equal distribution of the trust assets, Scott filed the Petition for Breach of Trust and Removal."

In arguing that probable cause existed to file the petition, Attorney Defendants cavalierly ignore the relevant portions of the statement of decision or the September 26 letter. Indeed, they completely fail to mention either in their opening brief or provide an explanation for their omission in their reply brief. Attorney Defendants either disregard

22

the existence of the court's key finding of bad faith and the September 26th letter or assume we will not read the record.

Attorney Defendants place great weight on the court's finding that Kendall, as trustee of the family trust, committed an innocent breach of trust. They extrapolate from this finding that probable cause must have existed for filing the petition. We are not persuaded.

The innocent breach found by the court stemmed from Kendall's use of the Liquid Assets before final distribution of the trust assets to the two beneficiaries. The court noted that a professional fiduciary would not have made this mistake, but found that Kendall spent the Liquid Assets "at a time he believed he and Janis had a common understanding about the likely ultimate distribution of the trust estate but before the ultimate distribution had actually been finalized and made." This innocent breach, however, bears no relationship to any of the allegations in Scott's petition for breach of trust and removal.

The allegations in the petition for breach of trust and removal focused on whether Kendall's claim that he owed the family trust $107,000 was accurate. It mentioned nothing about Kendall's use of the Liquid Assets prior to the final distribution of trust assets. Moreover, the court found that Kendall had proved that the $107,000 amount was accurate and noted that the subject promissory note proving the amount of indebtedness was provided to Scott's attorneys prior to the filing of the petition. The court also found the $107,000 figure supported by Kendall's interrogatory responses, Kendall's trial testimony, certain deposition testimony, Kendall's tax returns, and Chester and Jeanne

23

Kleveland's tax returns. Moreover, the court noted Scott's lack of any evidence to support his claim that Kendall owed more than the $107,000. Put differently, the evidence at trial, as well as documents and discovery responses available to Attorney Defendants prior to trial and, in some instances, prior to filing the petition,[10] all showed Scott lacked probable cause to proceed with the petition.[11]

We are also troubled by Attorney Defendants' contention that they had probable cause to file the petition for breach of trust and removal based on a dispute of the equalization amount Janis would have owed the family trust if she took title to the Rodney Property. Attorney Defendants argue Kendall's stated equalization amount of $65,000 was incorrect because Scott's "accounting expert" testified that the most Janis would be required to pay the family trust if she took title to the Rodney Property was about $26,000. However, Attorney Defendants fail to inform us that the trial court gave "little or no weight" to the testimony of this expert, noting Scott and Attorney Defendants failed to provide her with all relevant information. Attorney Defendants' argument in

_____

[10] The fact that Scott and Attorney Defendants possessed much of the information prior to trial, even if they obtained it after filing the petition, further supports Kendall's malicious prosecution suit and undermines the legitimacy of Attorney Defendants' anti-SLAPP motion. (See *Zamos v. Stroud*, *supra*, 32 Cal.4th at p. 973 ["continuing to prosecute a lawsuit discovered to lack probable cause" may also support a claim of malicious prosecution].)

[11] The gist of the trial court's findings on Scott's petition for breach of trust and removal is that it was completely meritless. As such, we are not persuaded by Attorney Defendants' assertion that Scott's claims were "arguably correct, even if it [was] extremely unlikely they [would] win[,]" and therefore, probable cause existed. (See *Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 742.) The trial court clearly did not find any of Scott's claims "arguably correct."

24

reliance on the accounting expert therefore is nothing short of an unabashed misrepresentation of the record.

We also are unimpressed with Attorney Defendants' contention that probable cause existed to "discover and adjudicate" the trust division. The court explicitly found that Scott filed his petition for breach of trust and removal to secure an inequitable settlement, unsupported by law or equity. The court stated, "Instead of making any meaningful effort to determine an equal distribution of the trust assets, Scott filed the Petition for Breach of Trust and Removal."

In summary, we struggle to contemplate a stronger example of a plaintiff showing a lack of probable cause than the record before us. In appealing this issue, Attorney Defendants misrepresented the record, ignored both clear authority and the trial court's findings, and failed to provide a single cogent argument. Not only was Attorney Defendants' position without merit, it clearly was frivolous.

## C. Malice

The malice element of the malicious prosecution tort goes to the defendant's subjective intent in initiating the prior action. (*Sheldon Appel*, *supra*, 47 Cal.3d at p. 874.) For purposes of a malicious prosecution claim, malice "is not limited to actual hostility or ill will toward the plaintiff. Rather, malice is present when proceedings are instituted primarily for an improper purpose." (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1157.) "Suits with the hallmark of an improper purpose" include, but are not necessarily limited to, "those in which: ' ". . . (1) the person initiating them does not believe that his claim may be held valid; (2) the proceedings are begun

25

primarily because of hostility or ill will; (3) the proceedings are initiated solely for the purpose of depriving the person against whom they are initiated of a beneficial use of his property; (4) the proceedings are initiated for the purpose of forcing a settlement which has no relation to the merits of the claim." ' " (*Id*. at p. 1157.)

Here, Kendall easily demonstrated malice. The trial court found that the petition for breach of trust and removal was filed with the purpose of forcing a settlement which has no relation to the merits of the claim. Moreover, the trial court found Scott had filed and pursued the petition for an "improper purpose." As such, there can be no colorable argument that Kendall has not shown malice, at least for purposes of defeating the anti-SLAPP motion. (See *Sierra Club Foundation v. Graham*, *supra*, 72 Cal.App.4th at p. 1157.) Attorney Defendants' argument otherwise is specious and requires us to ignore the record and clear authority.[12]

---

[12] Attorney Defendants also contend, as part of the trust litigation, they had to defend Scott against Kendall's attempts to remove Scott from the Rodney Property and collect rent for the period Scott occupied the property. They note the trial court denied Kendall's request to evict Scott and charge rent, but Scott did not sue Kendall for malicious prosecution. This argument has no bearing on whether Kendall demonstrated a probability of success on the merits in opposing the anti-SLAPP motion. In addition, the trial court ruled that Kendall was authorized to sell the Rodney Property; Kendall was authorized to evict Scott and his family from the Rodney Property to facilitate the sale of the property; and if Scott and his family had not vacated the Rodney Property by January 1, 2009, Kendall was permitted to charge them the fair rental value of the Rodney Property. More than likely, Scott did not bring a malicious prosecution action because he realized he had no grounds for such a suit. Kendall, on the other hand, had no such impediment.

26

*ATTORNEY FEES AND COSTS*

Relying on *Childs v. PaineWebber Incorporated* (1994) 29 Cal.App.4th 982 (*Childs*), Attorney Defendants contend the court abused its discretion when it awarded Kendall his attorney fees and costs as sanctions because the court failed to provide specific facts to support its findings that the motion was "frivolous and/or intended to harass" Kendall. We disagree.

In regard to ordering sanctions, the court in *Childs*, *supra*, 29 Cal.App.4th at page 996 stated: "A trial judge's on-the-record oral recitation of reasons for imposing sanctions is insufficient. But no more is required than a written factual recital, with reasonable specificity, of the circumstances that led the trial court to find the conduct before it sanctionable under the relevant code section. [Citation.] This means the court's written order should be more informative than a mere recitation of the words of the statute." Here, the superior court's minute order satisfied these requirements. The court stated that the motion was frivolous and/or intended to harass Kendall. It then proceeded to explain its reasoning for this conclusion, specifically citing case law and facts to support its order. In addition, it cited to the statute (§ 425.16, subd. (c)(1))[13] under which it awarded sanctions. Nothing more was required. (*Childs*, *supra*, 29 Cal.App.4th at p. 996.) Attorney Defendants' argument to the contrary had to result from their failure

---

[13] Section 425.16, subdivision (c)(1) states in relevant part: "If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5."

to carefully read the entire minute order or their intentional misrepresentation of the record. Either way, their argument is once again frivolous.

Attorney Defendants also contend the award of attorney fees and costs violated due process because there was no separate notice seeking fees. Attorney Defendants failed to provide any authority that a separate notice was required. "Adequacy of notice is not dependent upon an arbitrary number of days notice but should be determined on a case-by-case basis to satisfy basic due process requirements." (*Childs*, *supra*, 29 Cal.App.4th at p. 996.) Here, the court awarded sanctions per section 425.16, subdivision (c)(1), which permits a plaintiff to be awarded his reasonable fees and costs under section 128.5 if the court finds the special motion to strike is frivolous or solely intended to cause unnecessary delay. The court found Attorney Defendants received adequate notice because Kendall requested attorney fees and costs in his opposition to the anti-SLAPP motion and Attorney Defendants had the opportunity to respond to the request in their reply. Such notice and opportunity to respond complies with section 128.5, subdivision (c).[14] We find no due process violation in the awarding of reasonable attorney fees and costs in this matter.

Finally, Attorney Defendants contend their anti-SLAPP motion was not frivolous because the court acknowledged its merits in finding that Kendall's malicious prosecution action arose from the exercise of free speech or petition rights. Attorney Defendants'

_____

[14]    Section 128.5, subdivision (c) states: "Expenses pursuant to this section shall not be imposed except on notice contained in a party's moving or responding papers; or the court's own motion, after notice and opportunity to be heard. An order imposing expenses shall be in writing and shall recite in detail the conduct or circumstances justifying the order."

contention, however, is a logical fallacy. It is an accepted general principal of California law that a malicious prosecution suit is subject to an anti-SLAPP motion. (*Daniels v. Robbins*, *supra*, 182 Cal.App.4th at p. 215 ["The plain language of the anti-SLAPP statute dictates every claim of malicious prosecution is a cause of action arising from protected activity because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding."].) That said, it does not necessarily follow simply because a malicious prosecution suit can be subject to an anti-SLAPP motion that every anti-SLAPP motion brought against a malicious prosecution suit is automatically valid. Attorney Defendants' anti-SLAPP motion proves this point.

IV

*SANCTIONS*

After reviewing the briefs and record in this matter, we notified the parties we were considering sanctions for frivolous appeal. (*Flaherty*, *supra*, 31 Cal.3d at p. 654.) As such, we requested that the parties file simultaneous supplemental letter briefs discussing the propriety of sanctions for frivolous appeal being awarded to Kendall and this court, and for Kendall to submit proper documentation for a determination of such an award to him. Argument on the matter took place at the same time as oral argument on the merits of Attorney Defendants' appeal. Having thoroughly reviewed the matter, we grant sanctions.

Section 907 provides, "When it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may add to the costs on appeal such damages as may be just." Rule 8.276(a) gives us the authority to "impose sanctions . . . on a party or

29

an attorney for: [¶] (1) Taking a frivolous appeal or appealing solely to cause delay. . . ." In explaining these provisions, our Supreme Court has explained "an appeal should be held to be frivolous only when it is prosecuted for an improper motive--to harass the respondent or delay the effect of an adverse judgment--or when it indisputably has no merit--then any reasonable attorney would agree that the appeal is totally and completely without merit." (*Flaherty*, *supra*, 31 Cal.3d at p. 650.)

In determining whether an appeal indisputably has no merit, California cases have applied both subjective and objective standards. The subjective standard looks to the motives of the appealing party and his or her attorney, while the objective standard looks at the merits of the appeal from a reasonable person's perspective. (See *Flaherty*, *supra*, 31 Cal.3d at pp. 649-650.) Whether the party or attorney acted in an honest belief there were grounds for appeal makes no difference if any reasonable person would agree the grounds for appeal were totally and completely devoid of merit. (*Estate of Walters* (1950) 99 Cal.App.2d 552, 558.)

The objective and subjective standards "are often used together, with one providing evidence of the other. Thus, the total lack of merit of an appeal is viewed as evidence that appellant must have intended it only for delay." (*Flaherty*, *supra*, 31 Cal.3d at pp. 649-650.) An unsuccessful appeal, however, " 'should not be penalized as frivolous if it presents a unique issue which is not indisputably without merit, or involves facts which are not amenable to easy analysis in terms of existing law, or makes a reasoned argument for the extension, modification, or reversal of existing law.' " (*Dodge, Warren & Peters Ins. Services, Inc. v. Riley* (2003) 105 Cal.App.4th 1414, 1422.)

30

Although we recognize sanctions should be used sparingly to deter only the most egregious conduct (*Flaherty*, *supra*, 31 Cal.3d at pp. 649-650), we find them warranted here. Our review of the proceedings below, in light of the history of this matter involving the underlying trust litigation, Attorney Defendants' opening and reply briefs, their supplemental letter brief in response to our request, and oral argument, as well as the pertinent statutory and case law, convinces us any reasonable attorney would agree the grounds Attorney Defendants advance for appeal from the court's rulings on the anti-SLAPP motion and its award of $20,055 in attorney fees and costs under section 425.16, subdivision (c)(1) are totally without merit. The arguments offered are not supported by a careful reading of the record or the law nor could these arguments be reasonably characterized as presenting unique issues or arguing for extension, modification, or reversal of existing law. (See *Dodge, Warren & Peters Ins. Services, Inc. v. Riley*, *supra*, 105 Cal.App.4th at p. 1422.)

For example, the trial court in the trust litigation specifically found that the petition for breach of trust and removal was filed and pursued in bad faith and for an improper motive. Yet, nowhere in Attorney Defendants' opening brief do they mention this finding. This is all the more preposterous because this finding of bad faith was appealed and affirmed by this court. (See *Leach v. Kleveland*, *supra*, D054532.) Attorney Defendants only offer selective "facts" from the record that essentially ignore the findings in the trust litigation and ask this court to consider "evidence" that was explicitly rejected by the trial court. They offer no authority that permits this approach. They appear merely to pretend the results of the trust litigation were something they

31

clearly were not. Attorney Defendants attempt to reargue factual issues that have long

been decided (and affirmed on appeal) while ignoring the relevant statutes and case law.

At times, it is clear that Attorney Defendants brazenly misrepresented the record and/or

obscured facts.

We see no fact or authority that supports any of the arguments Attorney

Defendants raise in this appeal. Thus, after thoroughly reviewing the record and listening

to oral argument, we are persuaded by clear and convincing evidence (*San Bernardino*

*Community Hospital v. Meeks* (1986) 187 Cal.App.3d 457, 470) that any reasonable

attorney would agree the grounds advanced by Attorney Defendants here completely

lacked merit and would not have pursued this appeal.[15] (*Flaherty*, *supra*, 31 Cal.3d at

pp. 649-650.)

Our conclusion is further underscored by Attorney Defendants' flagrant violation

of rule 8.204(2)(C). They failed to provide a summary of significant facts limited to

matters in the record. Most extreme, Attorney Defendants failed to cite to the record

where the trial court found that Scott had filed and pursued the petition for breach of trust

and removal in bad faith and for an improper purpose. Such a finding was essential in

that it was the basis for Kendall's malicious prosecution action and was the primary

reason the superior court denied Attorney Defendants' anti-SLAPP motion and awarded

---

[15] We view Attorney Defendants' attempt to withdraw its appeal as to the merits of the denial of their anti-SLAPP motion as a tacit admission that they did not believe that portion of their appeal had merit. However, during oral argument, Attorney Defendants advanced these same contentions that they were "abandoning" under the guise that they supported their position that neither attorney fees nor sanctions were warranted. We are not convinced by this game of semantics.

Kendall attorney fees and costs. Attorney Defendants' failure to cite to this portion of the record or even address it is inexcusable.

Having concluded sanctions are warranted, we must determine an appropriate amount. "Factors relevant to determining the amount of sanctions to be awarded a party responding to a frivolous appeal include 'the amount of respondent's attorney fees on appeal; the amount of the judgment against appellant; the degree of objective frivolousness and delay; and the need for discouragement of like conduct in the future.' " (*In re Marriage of Gong & Kwong* (2008) 163 Cal.App.4th 510, 519 (*Gong & Kwong*); *Pollock v. University of Southern California* (2003) 112 Cal.App.4th 1416, 1434 [one goal of sanctions is to deter future frivolous litigation].)

As to the first factor, Kendall has told us he incurred $52,727.56 in attorney fees and costs related to this appeal. We find this requested amount reasonable and thus award it to Kendall.

Since there is no monetary judgment at issue, the second factor is less relevant to our analysis. We observe, however, that even though money is not involved here, Attorney Defendants' appeal has delayed Kendall's malicious prosecution suit. This is itself a burden on Kendall, who has been put to the trouble of defending a frivolous appeal after being embroiled in litigation lasting two years, initiated by Attorney Defendants' client, which proved to be meritless. (Cf. *Simonian v. Patterson* (1994) 27 Cal.App.4th 773, 786-787.)

In this case, the degree of objective frivolousness is very high. Attorney Defendants' appeal garishly distorts the record and has no basis in law or fact, and we

33

conclude that "[n]o competent attorney could conceivably believe in good faith" the appeal had any merit. (Cf. *Papadakis v. Zelis* (1992) 8 Cal.App.4th 1146, 1149.) Thus, the case is not a close one. (See *Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 34.)

It also should be obvious there is a great need to deter conduct of this nature in the future. This is especially true considering the number of attorneys involved in this appeal. Attorney Defendants consist of a law firm and three attorneys. They in turn were represented by two law firms and four attorneys. The sad fact that not one of the seven attorneys or three law firms involved in this appeal stopped this frivolous matter from proceeding is disappointing. We find it incredulous that seven pairs of legally trained eyes failed to see that the opening brief distorted the record and ignored the trial court's findings to such an extent that it is appropriately characterized as nothing short of a farce. "It is critical to both the bench and the bar that we be able to rely on the honesty of counsel. The term 'officer of the court,' with all the assumptions of honor and integrity that append to it, must not be allowed to lose its significance." (*Kim v. Westmoore Partners, Inc*. (2011) 201 Cal.App.4th 267, 292.) One of an attorney's duties is to employ only those means that are consistent with truth and never to seek to mislead us "by an artifice or false statement of fact or law." (Bus. & Prof. Code, § 6068, subd. (d).) We cannot sit idly by when several members of the bar fail to live up to the standards of the profession.

Beyond the breach of their duties to us, the conduct of Attorney Defendants and their counsel also has harmed others. "Respondent[s] . . . are not the only parties damaged when an appellant pursues a frivolous claim. Other appellate parties, many of

34

whom wait years for a resolution of bona fide disputes, are prejudiced by the useless diversion of this court's attention. [Citation.] In the same vein, the appellate system and the taxpayers of this state are damaged by what amounts to a waste of this court's time and resources. [Citations.] Accordingly, an appropriate measure of sanctions should also compensate the government for its expense in processing, reviewing and deciding a frivolous appeal." (*Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 17.) In this time of limited budgets and strained judicial resources, this court can ill afford to devote its attention to an appeal that is utterly without merit and clearly frivolous.

Consequently, we also find sanctions should be paid directly to the clerk of this court. (*Gong & Kwong*, *supra*, 163 Cal.App.4th at p. 520.) Appellate sanctions for frivolous appeals have recently ranged from $6,000 to $12,500. (*Kim v. Westmoore Partners, Inc.*, *supra*, 201 Cal.App.4th at p. 294.) These figures are generally, but not exclusively, based on the estimated cost to the court of processing a frivolous appeal. (*Ibid.*) In 2008, our colleagues in the First Appellate District cited a cost analysis by the clerk's office of the Second Appellate District indicating "the cost of processing an appeal that results in an opinion by the court to be approximately $8,500." (*Gong & Kwong*, *supra*, 163 Cal.App.4th at p. 520.) We find this amount appropriate for sanctions here.

DISPOSITION

The order is affirmed. As sanctions for a frivolous appeal, Attorney Defendants shall pay Kendall the amount of $52,727.56. Attorney Defendants also are assessed $8,500 sanctions for bringing this frivolous appeal, payable to the clerk of this court no

35

later than 15 days after the date the remittitur is filed.  The clerk of this court is directed

to deposit said sum in the general fund.

Kendall also is awarded costs on appeal.


HUFFMAN, Acting P. J.

WE CONCUR:



NARES, J.


McDONALD, J.


36